UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOSEPH TANNER, JR.                                CIVIL ACTION

VERSUS

CHARBONNEAU INDUSTRIES, INC.                      NO: 18-00866-BAJ-RLB

RULING AND ORDER

Before the Court is **Defendant's Motion for Summary Judgment (Doc. 22)**. Plaintiff Joseph Tanner filed a **Memorandum in Opposition (Doc. 30)**, to which Defendant filed a **Reply (Doc. 36)**. For the reasons stated herein, Defendant's **Motion (Doc. 22) is GRANTED IN PART, DENIED IN PART**.

I. BACKGROUND

Plaintiff was employed as a field service technician in Defendant's Geismar, Louisiana facility for approximately four years, beginning in July of 2013. (Doc. 16, at 2). Plaintiff, who suffers from epilepsy, experienced a seizure on April 19, 2017 while working off-site in Texas. *Id.* Plaintiff claims this seizure resulted from a change in medication prescribed by his physician. *Id.* He was released from medical care by his physician on April 21, 2017. *Id.*, at 3. In his deposition, Plaintiff testified that he has had epilepsy since he was 2 years old and diagnosed at the age of 12. (Doc. 30–2, at 11). Upon return to work, Defendant prohibited Plaintiff from performing a range of tasks on the job. Brian Vice, the Plant Manager, testified that these

restrictions were initially implemented as an internal precaution. (Doc. 30–4, at 22). Amanda Runnells, who worked in Defendant's human resources department, testified that as of Plaintiff's return to work on April 21, 2017, Defendant could not yet impose restrictions. (Doc. 30–9, at 4–5). Runnells interfaced with Automated Data Processing, Inc. ("ADP"), a provider of human resources management software and services, to discuss matters such as Plaintiff's leave and employment status. The initial release from Good Shephard, the hospital to which Plaintiff was admitted following his seizure, permitted Plaintiff to return to work one day from the date of the seizure and required him to follow up with a neurologist. *Id.* Plaintiff complied, and this second release, signed by a neurologist, permitted Plaintiff to return to work on April 24, 2017 with restrictions, including a note indicating that activities including driving are dangerous for the patient. *Id.*, at 76.

Following this second release, Plaintiff was stationed in the workshop for eight weeks, where he was not permitted to drive a vehicle or work around machinery or high-voltage electricity. (Doc. 22–2, at 12). Vice testified that Plaintiff "did very little" during this time and always had someone with him, but that this was due to internal precautions, rather than any order from a doctor. (Doc. 30–4, at 22). According to Billy Franklin, Plaintiff's manager, there were several tasks in the shop that Plaintiff was well-suited for, even after his seizure. (Doc. 30–3, at 12–13). Alternatively, Plaintiff had been in discussions with his supervisor to move to a position in shipping and receiving. Shipping and receiving paid less, but Plaintiff stated he was willing to take a pay cut. Franklin and Plaintiff never got to the point of establishing an

acceptable rate before Plaintiff's termination, but Franklin had hoped to raise the rate to $25 per hour, only $5 per hour less than Plaintiff earned as a field technician. *Id.*, at 14, 37.

As part of the interactive process[1] with Plaintiff, Defendant prepared a medical questionnaire to be completed by Plaintiff's physicians to elaborate on Plaintiff's status. On May 22, 2017, while Plaintiff was still working in the shop, this questionnaire was returned. Under the "accommodations" section, the questionnaire indicated that Plaintiff could perform all activities, but that caution should be taken for driving, climbing, and other activities. (Doc. 22–7, at 2). It also indicated that medical leave was not necessary, because seizures are unpredictable. It further restricted driving for a period of six months after Plaintiff's last seizure. *Id.* Under "reasonable accommodations that would eliminate the direct safety or health threat or reduce it to an acceptable level" the physician wrote that cautious steps can be taken towards driving and climbing. *Id.*, at 3.

Plaintiff alleges that on June 19, 2017, he was told that the following Friday would be his last day. (Doc. 16, at 3). He further alleges that he was told on July 7, 2017, that Defendant no longer has any full-time work available for him. In her deposition, Runnells testified that Plaintiff seemed to be confused about when he was terminated, as when someone is told that they don't have a full-time position available, the employee tends to assume termination. (Doc. 22–6, at 27). Runnells

---

[1] When an employee with a disability that is not open, obvious and apparent to the employer makes a request for accommodations, the employer is obligated to engage in an "interactive process," defined as a meaningful dialogue with the employee to find the best means of communicating that disability. *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009). Failure to engage in this process constitutes a violation of the ADA.

3

further testified that Plaintiff ceased coming back to work on July 7, 2017. *Id.*, at 15. However, per ADP's advice, Defendant did not formally terminate Plaintiff because Plaintiff intended to apply for FMLA leave. *Id.* at 27.

While he still worked for Defendant, Plaintiff obtained forms to file for leave under the Family Medical Leave Act ("FMLA"). (Doc. 16, at 3). Plaintiff testified at his deposition that he thought Defendant was supposed to fill out the FMLA paperwork because they told him he was not being let go for medical reasons, which Plaintiff disagreed with, but that he nonetheless believed that Defendant would not fill it out. (Doc. 30-2, at 37). He further testified that Runnells confirmed that she would not help him fill out the paperwork. *Id.* at 41. Ultimately, Plaintiff did not return the paperwork. Runnells testified that they had informed Plaintiff that, per company policy, he was required to inform the company by July 11, 2017, whether or not he would apply for FMLA leave, and that the company only proceeded with termination when Plaintiff failed to do so. *Id.* at 61.

Prior to his termination, Plaintiff retained an attorney and eventually filed suit alleging discrimination in violation of ADA and the Louisiana anti-discrimination laws, and the interference and retaliation under the FMLA. Vice testified that Defendant had planned to let Plaintiff go because he could not get clearance from his doctor to perform all of his usual job functions. (Doc. 30-4, at 23). In its Reply, Defendant defends its termination of Plaintiff by arguing that Plaintiff's proposed accommodations were not feasible both because there was not enough work to keep Plaintiff busy on a full-time basis in the shop, and that a shipping position

4

was not vacant at the time of Plaintiff's separation. (Doc. 36, at 2–3).

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it would affect the outcome of the case, and a dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Warren v. Fed. Nat'l Mortg. Ass'n*, 932 F.3d 378, 382–83 (5th Cir. 2019) (citation omitted).

In determining whether the movant is entitled to summary judgment, the Court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor. *Roberson-King v. Louisiana Workforce Comm'n, Office of Workforce Dev.*, 904 F.3d 377, 380 (5th Cir. 2018). The Court "resolve[s] factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013) (citation omitted).

"Where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *In re Louisiana Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017) (citation omitted).

## B. Americans with Disabilities Act

Plaintiff claims he was discriminated against by Defendant on account of his epilepsy, in violation of the Americans with Disabilities Act ("ADA"). Under the ADA, it is unlawful for an employer or prospective employer to discriminate against an otherwise qualified individual on the basis of a disability. 42 U.S.C. § 12122(a). A disability is defined as either (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of having such an impairment; or (3) being regarded as having such an impairment. 29 C.F.R. § 1630.2(g).

Absent direct evidence of unlawful discrimination, courts apply the *McDonnell Douglas* burden-shifting analysis to ADA claims for summary judgment. *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). Under the *McDonnell Douglas* burden-shifting analysis, if Plaintiff establishes a *prima facie* case of discrimination through circumstantial evidence, the burden shifts to Defendant to provide a non-discriminatory reason for failure to hire, after which Plaintiff must establish that the reason offered is merely a pretext for discrimination. *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016).

To demonstrate a *prima facie* case of employment discrimination under the ADA, Plaintiff must prove three elements: (1) he is an individual with a disability, (2) who is otherwise qualified to perform the job, with or without reasonable accommodation, and (3) he was subject to an adverse employment decision on account of his disability. *Id.* A "qualified individual" under the ADA is one who, "with or without reasonable accommodation, can perform the essential functions of the

6

employment position that such individual holds or desires." 42 U.S.C. § 12111(8); Accommodations under the ADA can include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices...and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).

Defendant brings a business necessity defense to counter Plaintiff's discrimination claim. The ADA provides an affirmative defense for qualification standards that would tend to screen out individuals with disabilities but are shown to be job-related for the position, and consistent with a business necessity. 42 U.S.C. § 12112. When evaluating whether risks addressed by safety-based precautions constitute a business necessity, courts consider the magnitude of possible harm as well as the probability of occurrence. *E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000). To establish this defense, Defendant must show that its qualification standards are: (1) uniformly applied, (2) job-related to the position in question, (3) consistent with business necessity, (4) cannot be met by a person with Plaintiff's disability, even with a reasonable accommodation. *Atkins v. Salazar*, 677 F.3d 667, 682 (5th Cir. 2011). To be job-related, Defendant must show that the qualification is necessary and related to the specific skills and physical requirements of the position. *Id.*

Louisiana's anti-discrimination law, under which Plaintiff brings a claim, La. R.S. 23:301, is generally guided by the ADA and applicable jurisprudence, and is thus analyzed under the same framework. *Thomas v. Louisiana Casino Cruises, Inc.*,

2003-1937 (La. App. 1 Cir. 6/25/04), 886 So. 2d 468, 470, *writ denied*, 2004-1904 (La. 10/29/04), 885 So. 2d 598.

**C. Family Medical Leave Act**

Plaintiff alleges that Defendant interfered with, and/or retaliated with his rights under the FMLA in violation of 29 U.S.C. § 2615(a)(1), which states that it "shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Pursuant to revisions made to the FMLA in 2009, employers are explicitly allowed to condition FMLA leave on following the employer's policy. *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 790 (5th Cir. 2017). Further, the employee must give the employer notice of the intention to take leave under the FMLA in order to be entitled to it. *Id.*, at 788. Absent unusual circumstances, FMLA-protected leave may be delayed or denied where an employee does not comply with the employer's usual notice and procedural requirements. *Id.* at 789.

To establish a *prima facie* case of interference under the FMLA, Plaintiff must show: (1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to leave; (4) he gave proper notice of his intention to take FMLA leave; and (5) his employer denied him the benefits to which he was entitled under the FMLA. *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017).

To establish a *prima facie* case of retaliation under the FMLA, Plaintiff must demonstrate that (1) he engaged in a protected activity, (2) the employer discharged him, and (3) there is a causal link between the protected activity and the discharge.

8

*Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005). Absent direct evidence of discriminatory intent, summary judgment for a retaliation claim under the FMLA is subject to the modified *McDonnell Douglas* test. After establishing *prima facie* retaliation, the burden shifts to the employer to demonstrate a legitimate, non-retaliatory reason for the employment decision. *Id.* at 333. Plaintiff must then show either (1) that the employer's reason is a pretext for discrimination; or (2) that the employer has a discriminatory or retaliatory motive in addition to a legitimate reason, or mixed motives. *Richardson*, 434 F.3d at 332. If the employee demonstrates that the employer had a mixed motive, then the employer must show that it would have conducted the same employment action regardless of the discriminatory motivation. *Id.*

### III. <u>DISCUSSION</u>

#### A. ADA Claim

Defendant argues that its termination of Plaintiff had a two-fold non-discriminatory justification. First, that Plaintiff could not perform the "essential functions" of his job because of restrictions that doctors had imposed upon Plaintiff following his seizure. Second, that there were no reasonable accommodations available, either by modifying Plaintiff's current position or by transferring him to an alternative position. However, the evidence in the record reveals conflicting testimony concerning the "essential functions" required by Plaintiff's position: whether Plaintiff had medically imposed restrictions preventing him from fulfilling the duties of his job, and whether there was work available for Plaintiff, either in the

9

shop he was working in or in the shipping and receiving department.

Defendant argues that Plaintiff could no longer fulfill the essential functions of his role as a field service technician. However, Defendant relies on the medical questionnaire for this job description, which was not returned until May 22, 2017, after the incident had occurred. (Doc. 30–9, at 22). The record is unclear as to whether a formal job description existed before Plaintiff's seizure. Further, it is not disputed that Plaintiff was capable of performing all of the tasks his job required prior to his seizure, and that he was prohibited from performing many of these tasks by Defendant only after the seizure. While Defendant claims that these limitations were imposed in good faith reliance on restrictions by Plaintiff's physicians, Franklin testified that the restrictions ultimately came from the company's human resources department. (Doc. 30–3, at 27). Vice corroborated this, testifying that at the time Plaintiff returned to work, he did not believe there to be any restrictions imposed by a doctor, but that the company wanted to indefinitely prevent Plaintiff from driving a truck until more was known about Plaintiff's condition following the seizure incident. (Doc. 30–4, at 8–9). With respect to the second release, it is unclear whether the physician intended to impose absolute restrictions. The subsequent medical questionnaire is clearer relative to the intent to impose restrictions, but it suggests that the restrictions may only be imposed for a period of several months.

In response to Plaintiff's claims that reasonable accommodations were available, Defendant first argues that keeping Plaintiff employed in the company workshop "would result in Defendant 'fashioning' a new job," citing *Toronka v. Cont'l*

*Airlines. Toronka* held than an employer is not required to fashion a new job in order to provide a reasonable accommodation to an employee. *Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 726 (5th Cir. 2011). Defendant further argues that "[r]easonable accommodation does not require an employer to wait indefinitely for the employee's medical conditions to be corrected." *Silva v. City of Hidalgo, Tex.*, 575 F. App'x 419, 423 (5th Cir. 2014). However, as the medical questionnaire specified, Plaintiff's restrictions were not indefinite—he was restricted from driving for six months after his last seizure and urged to take cautious steps to return to driving. Such restrictions do not mandate "indefinite" accommodation. Further, both Plaintiff and his direct supervisor testified that there were significant projects in the shop that Plaintiff could have handled, even with the limitations imposed on Plaintiff after his seizure.

With respect to the potential alternative accommodation, the shipping and receiving position, Defendant argues that this position was not available at the time of Plaintiff's termination. *Toronka*, 411 F. App'x at 726 (holding that a position must "first exist and be vacant" for a reassignment to be a reasonable accommodation). However, in the sworn deposition by Franklin, who was Plaintiff's direct supervisor, Franklin testified that there was an existing shipping and receiving position. Further, Vice testified that this position remained unoccupied for several weeks after Plaintiff's termination. (Doc. 30–3, at 4). Defendant argues in its Motion that Plaintiff "probably" would not have taken the pay cut for the shipping position, but offered no evidence to support that his manager had discussed this matter with Plaintiff, or had

11

any reason to believe it to be so beyond mere speculation. (Doc. 22–2, at 12 n.39).

For the same reasons that it fails to strike down Plaintiff's *prima facie* case of discrimination under the ADA and Louisiana law, Defendant also fails to establish a non-discriminatory reason that was not pretextual. Defendant argues that Plaintiff offers no evidence to disprove Defendant's proffered non-discriminatory reason for termination—that is, that Plaintiff was issued restrictions and there were no accommodations available. (Doc. 22–2, at 18–19). However, as discussed *supra*, Defendant fails to demonstrate as a matter of law, through the existing evidence in the record, that these reasons were valid, as there is conflicting testimony as to Plaintiff's ability to stay on board in his current position until his six month limitation on driving expired, or alternatively that he should have been relocated to the shipping and receiving position.

Even if Plaintiff is able to bring a *prima facie* claim of discrimination under the ADA, Defendant argues that a business necessity defense should apply. To support this, Defendant extensively discusses the balance of harms, specifically the magnitude of damage that could result if Plaintiff were to suffer a seizure while performing various tasks, particularly driving. Defendant avers that the potential harm is so great that even if it is very unlikely to occur, the balance favors the limitations. (Doc. 22–2, at 15). Defendant does not address Plaintiff's argument that the seizure resulted from a change in his epilepsy medication, which could make future seizures more predictable and reduce the risk of an unexpected episode.

Defendant fails to establish the elements required for a business necessity

12

defense, which requires that the limitations be (1) uniformly applied, (2) job-related to the position in question, (3) consistent with business necessity, (4) cannot be met by a person with Plaintiff's disability, even with a reasonable accommodation. *Atkins*, 677 F.3d at 682. Defendant fails to provide any evidence that such restrictions are uniformly applied. In fact, the record contains testimony concerning two other medical incidents, one with an employee named Mr. Higginbotham suffering a heart attack, and one with another named Mr. Anders who suffered "an aneurysm or something," and required surgery. (Doc. 30-3, at 31–33). Franklin testified that neither of those employees had restrictions imposed on them upon returning to work, despite suffering these episodes on the job. Additionally, Defendant does not establish that Plaintiff could not meet the job requirements, even with accommodations. Accordingly, Defendant fails to establish a business necessity defense.

**B. Family Medical Leave Act Claims**

Plaintiff argues that he only needs to show evidence that his employer denied him rights under the FMLA in order to overcome summary judgment on both his interference and retaliation claims. (Doc. 30, at 9). It is not so simple. Absent unusual circumstances, this Circuit explicitly allows employers to condition FMLA leave on the requirement to follow company leave procedures, opening the door to valid denial of FMLA rights. *Acker*, 853 F.3d at 790.

Defendant sufficiently demonstrates that it did not retaliate against Plaintiff under the FMLA. To establish a *prima facie* case of retaliation under the FMLA, Plaintiff must demonstrate that (1) he engaged in a protected activity, (2) the

employer discharged him, and (3) there is a causal link between the protected activity and the discharge. *Richardson*, 434 F.3d at 332. Per Plaintiff's own admission, Plaintiff never filed the paperwork for FMLA leave. (Doc. 30–2, at 51). Plaintiff claims that this is because Runnells refused to help him fill out the paperwork. (Doc. 30, at 10). However, Plaintiff offers no evidence that Defendant's policy would have required Runnells to do so but did testify that he believed Defendant would not assist in this way. Plaintiff also fails to demonstrate the necessary causal link. Rather than terminate Plaintiff for requesting FMLA leave, internal emails and emails to Plaintiff alike indicate that Defendant was unwilling to terminate Plaintiff until they were sure he was *not* filing.

In the alternative, Plaintiff argues that Defendant interfered with his right to FMLA leave. Plaintiff argues that Runnells directly prevented him from attempting to inquire and file for FMLA leave by stating he could not do so, and by threatened that if she "dug deep enough," she would "find a reason [he] couldn't work there." (Doc. 30, at 10). Plaintiff argues that Defendant's argument that Plaintiff failed to follow Defendant's FMLA procedure is irrelevant, that Plaintiff provided proper notice, and that Runnells made it perfectly clear that Plaintiff could not file for FMLA. (Doc. 30, at 10).

Adhering to company FMLA procedure is anything but irrelevant. As referenced above, employers may condition FMLA leave on following their policies. Defendant had the paperwork sent to Plaintiff, which included a requirement that it be filled out and returned within 15 days. Plaintiff did not do this. The facts and the

law do not support Plaintiff's argument of interference. Runnells even testified that when Plaintiff filed for FMLA leave, they "put everything on hold." (Doc. 30–9, at 55). Plaintiff admitted in an email that he never filled out he papers for FMLA, seemingly because he believed he was already terminated, despite Defendant's assertions to the contrary. *Id.*, at 100.

Defendant sufficiently demonstrates that it did not interfere with Plaintiff's rights under FMLA—it specifically postponed termination proceedings to determine whether Plaintiff intended to go through with filing. Plaintiff's confusion as to Defendant's policy does not show that Defendant lacked an adequate policy to secure FMLA leave if properly requested. The record contains several email messages exchanged with Plaintiff informing him that he was not terminated and inquiring about the status of his FMLA filing. Even after Plaintiff had retained counsel, Defendant admitted through its attorney in an August 23, 2017 email that they would be willing to give Plaintiff another opportunity to file the FMLA paperwork, as Defendant had not yet officially terminated Plaintiff. (Doc. 22–11, at 2). Defendant sufficiently demonstrates that it neither interfered with Plaintiff's FMLA rights, nor retaliated against him for attempting to exercise them.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that **Defendant's Motion for Summary Judgment (Doc. 22)** is **GRANTED IN PART, DENIED IN PART**.

15

**IT IS FURTHER ORDERED** that Plaintiff's claims alleging interference or retaliation with respect to his rights under the FMLA are **DISMISSED WITHOUT PREJUDICE.**

Baton Rouge, Louisiana, this 20th day of December, 2019.

_____
**JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**